Good morning, and may it please the Court, my name is Justin O'Dell of O'Dell & O'Neill out in Marietta, Georgia. I'm here on behalf of the appellants who are investor victims in a receivership matter that was pending in the U.S. District Court for the Northern District. I want your Honors to imagine coming home tonight and finding in the mail a letter. That letter states that it's from a collection agent on behalf of the United States government. That letter says that the car that you're driving is stolen and that a hearing was held and it was determined that that car had been stolen. Now, of course, you weren't present at that hearing. You didn't know about it. Maybe it was even held in another state. You are told that you have two options. You can return the car that we have figured out is stolen or you can pay us $100,000. Now, there's nothing indicating that the Court determined that it was worth $100,000, but the collection agent has made that determination and you can take their word for it. The next thing you get in the mail is a docket entry, not an order, a docket entry from a district court, maybe in another state, that says you have three days to explain yourself as to why you don't believe you should have to turn over your car or pay the $100,000 that has been determined, not by a court, but by my collection agent. You write a letter to the collection agent and say, this doesn't seem right. Object. Without you knowing, that letter gets forwarded to that court, apparently reviewed. There's no hearing held. You're never allowed to present evidence. You're never allowed to tell that U.S. District Court judge, I don't think this car, I don't think you've got the right car, or if you do, I'm not sure it's worth the $100,000 that they say it is. In this case, the investors were given an opportunity to oppose the application of the liquidation plan. That's correct. If you look at the Elliott case and the Liberty Capital case, in both cases, you have to be able to challenge the content of the distribution plan before we get there. See, the life insurance investors- But there's some investors who did take advantage of the opportunity to oppose the application of the liquidation plan in this case. My clients raised these due process objections, but the problem is, they were allowed to oppose the method of distribution. We were not allowed to challenge the amount that we had already paid back. Ms. Gravitt, whose story I'm telling you, has already been held in contempt and ordered to pay the money by the time we get to the plan. She was held in contempt. The narrative I'm telling you is her story. The first opportunity she had was at that plan, even at that plan. We have some precedent to guide us, and that's Elliott versus the Securities and Exchange Commission, and there wasn't even a hearing in that case. Correct. It seems to me like the investors in this case had more procedural due process than the investors in the Elliott case. The Hagstroms and the Schutzmans, both investors in the Elliott case, this court reversed the district court and held in those two cases that the investors in that case were not afforded due process where they were just given a blank form and they were only allowed to object to the plan. What the court said was critical as to Hagstrom and Schutzman, the investors in that case. The court said where you can only file an objection to the plan, but you were not allowed to conduct discovery or present evidence on claims and defenses that you believed you've held that the situation violated due process. If you were permitted to conduct discovery, what exactly would you have been looking for? Sure. We would have first looked to how the receiver determined this fictitious profit amount that they're saying we have to pay back. To continue my analogy, how did you calculate how much my car is worth that you're telling me I have to pay back? We were never allowed to challenge how that amount was calculated. That amount was never put forth and approved by a judge until the liquidation plan. We were never allowed to raise a very meritorious contractual defense that we have, which says that when we bought the policy, we paid more money for it on the grounds that the corporation was going to pay the premiums. Therefore, it's not a fictitious profit at all. We're entitled to a set off, but we were never allowed to raise that defense and claim or force the receiver to articulate what that claim was. In the Schutzman case, or in Schutzman, which is in the Elliott case, the question you raised, Judge, was raised by the appellees in that case. They said, wait a minute. Schutzman would never have been able to present anything. The court actually addressed that and said, it may very well turn out that Schutzman is unable to dispute the facts at issue. The court said that. However, we don't get there until they've had an opportunity. It's the old analogy of saying, well, we know the guy is guilty. He's not going to be able to prove he's innocent, so why does he need a jury trial? Let me ask you something about the merits of what the receiver did. The district court's brief seemed to be at odds, at least the way I read them, about what your client's contracts with CN provided for. What did they provide for, in your view, with regards to the payment of premiums once your client had made the initial payment? I think your client paid $155,000 as a purchase price for the Martin policy, right? That's correct. The Martin policy had a face value of $235,000. You're speaking of Mr. Sutherland. My notes don't indicate the name of the person, so you can tell me which one it is. What did the contract provide? The contract, our position, our position is that the contract provided that he paid, and we set this forth in the Sutherland argument to the district court, he paid a premium. He paid more than the policy was worth on the understanding that the corporation would continue to pay the premiums as part of the money it was receiving. He would not be obligated to do so. He didn't pay more than the face value. You're saying he paid more than the market value. Correct. But not the face value. Correct. He paid more than the policy was worth because you're going to pay the premiums for me. I'm not going to have to pay those. In some instances, these investors buy them at a discount on the understanding that they will pay the premiums, but we believe, particularly as to that policy, that we have a meritorious argument that, wait a minute, the deal, the bargain for exchange, we have a contractual defense to your attempt to recover these fictitious profits. The problem is we were never allowed to articulate it. Hold on. I'll let you get your word out. The district court said, and it may have been incorrect if you are right, that the fictitious profits argument that was raised at the end of the process lacked merit because people like Mr. Sutherland, the direct investors, had to pay or reimburse CN for the premiums that CN paid. How can there be such diametrically opposed views of contractual language? I'll suggest to you, and I say this with all, the district court can't make that determination because the district court never had a hearing about it. No, no, no. Forget the hearing. I presume that there's a contract somewhere. There is. I presume you presented the contract at some point. We filed it in the Sutherland objection. For Ms. Gravitt, it was too late. She never even had the chance. We're talking about Mr. Sutherland's example now. For him, the contract was filed. You know what at least the text says. The district court presumably knows what the text says. The receiver presumably knows what the text says. How can there be such diametrically opposed views about reimbursement of CN for the premiums paid? I think because there's a difference of opinion as to what was required under the contract regarding the payment of premiums. There was correspondence associated with the contract with CN Capital that the receiver does not want to bind itself to, that Mr. Sutherland seeks to bind as part of the contract. Extrinsic to the contract. Correct. And Mr. Sutherland, but it's referenced and Mr. Sutherland wants to be able to argue that as a fact issue to say we paid a premium so that I didn't have to continue to pay this. There's also performance. He didn't pay the premiums. The company did. So performance is evidence of what the contract would require and we believe that we should have an opportunity to at least present that in some form. I want to be clear, we're not talking necessarily about a plenary versus summary proceeding. I also think this case got sort of off the rails on the argument that what we're asking for is that every one of these cases has to be tried to a judge and a jury. What Elliott requires and what the Liberty Capital case requires is that you have to have some forum. I'm not saying you can use summary proceedings, but give us a special master, give us a magistrate, give us some arbiter to which we can present our case and defenses and that arbiter can make a decision about who's right and who's wrong and whether your proverbial car really is worth $100,000. That's all we're asking for is that opportunity. We're not saying that in every one of these investor cases it would be an overwhelming burden to impose and I understand that to say that in every one of these you had to go through a complete plenary proceeding, but summary proceedings require something. Ms. Gravitt was given a total of three days by docket entry. That was her entire opportunity to oppose the receiver and then she sent an objection and there was never an evidentiary hearing conducted. Then she was incarcerated on a contempt and she didn't even have an evidentiary hearing on the contempt as to why she believed there was an objection and then an award of attorney's fees was made and there was never an evidentiary hearing or cross-examination on the attorney's fees. Well, you don't need an evidentiary hearing on everything. No, but you're entitled to at least confront and cross-examine the evidence. Not always. District courts, and I'm not saying that this principle applies in your case, but there are often times that district courts rule on the papers. Correct, but opposing counsel is at least allowed to submit an argument. They said, oh, and I'm going to give you attorney's fees. No, but you're talking about an evidentiary hearing as opposed to a hearing at all. Right, but the submission of their attorney's fees is the submission of evidence and opposing party is at least entitled to respond to that evidence and say, I don't think those fees are reasonable. And you didn't get a chance to do that? No. Why not? The award was made at the hearing. Send us your bill and I'll enter it. Did you ask for an opportunity to respond? I filed an appeal trying to get Ms. Gravitt out of it. I asked for an opportunity to respond to the whole thing and was never given the chance. We were sent home in less than 10 minutes from Ms. Gravitt. I wanted a hearing on the underlying objection and was never afforded it. I couldn't even get anywhere trying to argue for a hearing on attorney's fees. I'd have been held in contempt. But did you have an opportunity to make an argument? No, the brief was sent in. I did make an argument on Ms. Gravitt's contempt. I said she shouldn't be in contempt because she hasn't been afforded the underlying opportunity to object. I tried to raise the due process and I was told, we're not hearing about that. That's over. I've ruled. She owes the money. She can turn over her policy or else. That's it. She was never allowed to contest the amount at any point. She was never served with any ... In the Elliott case, in the Liberty case, say, you've got to be afforded something. You have to be afforded two things, some form of discovery as to how the other side came up with what they're coming up with. I'm not saying four months, six, something, some exchange of information. You have to be able to present evidence and argument and be heard. It goes back to the Moulin case. I know all of you are familiar with it, but some degree of fundamental due process has to attach. In this case, none of these investors, my loan investors, were never given anything. The first time they saw their numbers is exactly what happened in Hagstrom. They got a blank form, tell us what you owe. We've determined what you owe. We've determined what we think you've already been paid. We the receiver, not the district court. You can object to the plan as to how we're going to distribute it, but there shall be no questioning our amounts. What was the ultimate ... Moving aside from the due process issue, the district court pointed out in one of its last orders that the rate of distribution for clients like yours was somewhere around 30%. Correct. Is that accurate? I think that's in the ballpark, yes. Okay. And that some of them potentially stood to recover close to 100% of their investment? Here's the argument. The Perkins case says that we have a right to actually claim up to 100% of our settlement because that's not the gross profits that are clawed back in a Ponzi scheme. That would be our argument. We have a very good Perkins argument. We also set forth that we have a very good statute of limitations argument on some of these funds. Some of these payments that they're effectively clawing them back by giving us credit for them. Instead of doing a clawback summary proceeding, they're saying, we're not going to do that. We are the judge, jury, and executioner. You already got that money. We've ruled on that. You don't get any more. We never got to assert a Perkins defense or statute of limitations defense that some of these funds are outside of your reach. You don't get to reach them for my loan investor clients. You can object to the plan. You think the method is unfair, rising tide versus these other methodologies. By the way, the plan objection hearing was not an evidentiary hearing. We were limited to 15 minutes of oral argument. Let me ask you quickly so you don't run out of time about the two jurisdictional issues. On Sutherland, there's a jurisdictional question. There are jurisdictional questions in both. We can start with Sutherland. I think that's the more narrow jurisdictional question. Sutherland is appealing from an order. It's the same contempt intervention process that happened to Ms. Gravitt. Ms. Gravitt appealed after being found in contempt. We were told it was too late. It was interlocutory or it was moot because she had purged herself because she's a mother and she doesn't want to spend time in the U.S. District Jail. She paid the money and that ended it for her. She appealed at the end and she's entitled to- She kept the policy then? She paid the- And paid the so-called fictitious profits. Fictitious profits. She kept the policy, whereas Mr. Sutherland turned in the policy. He designed the policy under penalty of contempt. No, no. I understand that, but that's the route that he took given the options available to him. He appealed the order before the contempt came down because this appeal happened at the same time so the two could be taken up together. The authority comes under 1292, specifically A-1 and A-2. Any order, jurisdiction is granted for an appeal of an interlocutory order where there is a step in a receivership, specific to receiverships, directing sales and disposals of property or continuing, modifying, granting, refusing, dissolving injunctions. Then lastly- Those are separate provisions, right? I thought 1292 A-2 dealt with orders, quote unquote, refusing to take such steps in a receivership. 1292 A-2 deals with the receivership order. In this case, the provision is the order providing for the directing of sale or disposal of property. Our position was going to be if they've got our policy, they're going to dispose of it. I know, but I thought that there was a qualifier that the order had to be an order, quote unquote, refusing to take certain action under 1292 A-2. Am I mistaken about that? That's not my interpretation. My interpretation- Then lastly- You also think, I don't think that's your strongest argument. Your argument, and I think the receiver agrees, that the order is appealable under 1292 A-1. Right? Because this is an order, at the very least, continuing an injunction. The SEC concedes as well. In its brief, the SEC concedes that as well. The jurisdictional question, this case is postured at the exact point that the court reviewed the Elliott case and the Liberty Capital case. Could we agree with the three other circuits who tell that in order of approving a distribution plan and authorizing the distribution of assets is appealable under the collateral order doctrine? You could. That's why the Sutherland Appeal was taken up, again. I think the strongest argument is it's continuing modifying or dissolving injunction, but it would certainly come up, once one comes up, the collateral source rule or the collateral attachment rule would pull up everything else with it for review. In the brief, I think everybody understands that this needs to be reviewed now. We don't want to, if we have made a due process error, if the SEC has made a due process error, we don't want to send everybody all the money, close the case, and then take it up. From a fundamental interest of justice and equity standpoint, logic would dictate to get this reviewed now, because if we need to go back and fix something and give people a due process defense, we certainly need to do it now, as opposed to when we sent out all the money. That's really what we're asking you to do, is intervene at this point, because... What about the potential problem concerning mootness with the turnover or assignment of the policy for Mr. Sutherland? To address that argument, the compliance with the order, I don't believe, moots his appeal because his property interest has still been taken, pursuant to a contempt. It's the equivalent of appealing the contempt citation that would have issued, but it didn't. I don't believe his appeal is moot. Even if it were, it's an error subject to repetition. The receiver's not done. It would be an error subject to repetition, and the court needs to give direction on that now so that we don't repeat it, and I don't have investors sitting in jail, appealing from the prison cell, trying to get some due process. It would need to come up that way and have this court examine it. I think the SEC's brief acknowledges, at least to some extent, that that's a remedial action. I'm not saying they agree with me, obviously, on the underlying issues, but that it does need and does warrant review. The other argument that I anticipated, or the question that I anticipated is, so what do we do? Of course, what I'm asking you to do is remand it to the district court to reverse the orders entered by the district court related to the policies that have been issued, ordering people to surrender those policies, holding people in contempt for penalty of violation of those policies, and the order approving the distribution plan, and to direct that the district court conduct a summary proceeding that affords people who raise objections some degree of due process. That includes the right to limited discovery, to present evidence, notice, and opportunity to be heard before some arbiter. It can be a special master, a magistrate, or something like that. There is a concern, I think, and I understand the concern of saying, well, that's going to cause chaos in the receivership. My response to that is, I've been raising this as soon as I could. As soon as Ms. Gravitt hired me, she was given a few days to hire me. She did. I ran the district court and started raising these problems. It could have been held up at any time. I raised the warning flags, and it wasn't. The receiver could have stopped. The district court could have stopped. They've worked themselves into this corner. The old saying is, let justice be done, though the heavens may fall. This may cause some difficulty to give my clients due process, but the interests of fairness and justice always prevail when there's been a due process violation. That's what we're asking you to do here, is just give these people some opportunity to go in and say, my car is not worth $100,000. First, I don't think it's stolen. If it is, I'm a bonafide purchaser, and I've got defenses to why you're entitled to have it. But even if you are, even if you can prove that, it's sure not worth $100,000. Were any of the merits-based arguments that you were trying to raise independent of the commingling of money by CN and its principles? The merits of some of the arguments included some of the set-off and other defenses, yes, if I understood your question correctly. One of the ones that we talked about was your contention that some of the correspondence between Mr. Sutherland and CN allowed for a conclusion or a finding that CN was going to pay the premium. Right. But do those arguments in any way account for the commingling of funds within the receivership? You mean the receivership entities? Yes. We have no way of understanding whether that applies or not because we have no discovery as to how they accounted for it. We don't know on their end ultimately which entity paid it, which didn't. We know from their allegations that all kinds of funds were commingled. There were no evidentiary submissions by the receiver? No. Nothing was submitted. They said, we calculated the amount by looking at our records and determining how much had been paid. We never got the discovery to challenge that calculation. We never got a hearing to say we disagree with that calculation. The investors were given a letter that says, we've determined this is your bill. When they objected, Ms. Gravitt got a notice that three days later you were going to be held in contempt. Counsel, in your reply brief, you state that there was no process in this case. Now, explain to me why your opportunity to object was not sufficient in this case. I understand the question to be the opportunity to object. Ms. Gravitt had the three-day window of time, not the opportunity to object at the distribution plan because by then it's a foregone conclusion. The amounts were set. The confusion that had arisen in my attempt was to distinguish the difference between an argument. People were beginning to say that I was attempting to assert that we're entitled to some kind of plenary full-on proceeding. I wanted to clarify, this is not a question where my investors are saying they used summary proceedings and we think plenary proceedings were required. My position is there were no summary proceedings. There were no proceedings. Three days is not due process. A complete lack of discovery and a complete lack of any evidentiary hearing. There have been no evidentiary hearings since I entered this case. That is no due process. That's not summary due process. That is no due process. Ms. Gravitt, Mr. Souther, there has not been an evidentiary hearing. They have not testified in this case. They have not cross-examined a witness in this case. They have not cross-examined the receiver in this case, ever, in front of a magistrate, a special master, anything. This is not, I wanted to clarify that this is not an argument that started to be made about we're not entitled to a plenary proceeding because summary proceedings are appropriate. This is a case where summary proceedings were not even utilized. I think we have your argument, counsel. Thank you. I've got about, I think, five minutes for rebuttal. All right. Now, we'll hear from Ms. Weber. Thank you, Your Honor. May it please the Court, my name is Amy Weber and I am here today representing Al Hale in his capacity as receiver for Credit Nation Capital. I'm also joined today by Kelly Mulally, who represents the receiver, and Terese Scheuer, who is attorney for the SEC. Let me tell you what my concerns are so you can address them at some point during your argument. Putting aside the opportunities that the appellants were given or not given, my impression from reading the briefs and some of the orders is that the receiver never submitted any evidence to show how it had come to its calculations and conclusions. Is that accurate? No, that's not accurate. Where did the receiver submit? In our motion for distribution plan, in our exhibit. But that's at the end of the process. Correct. That's before you've told people what the fictitious profits are. At the initial part of the case, when you send the letter, when the receiver sent the  to either assign the policy or pay the fictitious profits with regard to direct investors. What did the receiver submit to the district court to justify its conclusions? The receiver submitted a motion to the district court saying that based on the economic status of Credit Nation, in order to preserve the assets of Credit Nation, it was essential for Credit Nation to raise funds to pay the premiums because these were wasting assets. If premiums weren't paid, then the assets would be gone. I know the argument. I want to know what evidence was presented. So Credit Nation, honestly, I can't recall what we submitted to the court, but... I don't think there was any evidence presented. It was just the receiver's position and conclusions from its investigation. Normally, when a party tells a court, we believe X, a court is not required to believe that and the opposing party is entitled to challenge that. What I want to make sure there's a correct characterization is when we're telling the direct investors, this is what you owe, it's basically if the direct investor chooses to remove that asset from the receivership estate. If the investor chooses not to pay that money, they're not deprived of a property right. That means that the policy, where they are a direct investor, would go into the general fund, a policy that the receiver would sell, and the proceeds from that sale are put into the pool. I know. Right. And that a direct investor, so it's not a deprivation of property. I'm not even at that point yet. I'm asking to... As a district judge, I handled a number of receiverships. And normally, if no one objects to what the receiver is doing, and the receiver submits at least some evidence of why it's doing what it's doing, a district court is likely to think, okay, everything's proceeding according to pace. Everything makes sense to me. I'm going to approve the relief that the receiver is requesting. But whenever somebody says, stop, I object, there's a problem, it becomes in the nature of an adversary process. And the receiver, like any other party, is required to explain and justify what it's doing. So my question again is, what did the receiver submit in terms of evidence to justify its initial calculations about the fictitious profits? As far as how much they needed to collect from each person. Yes. They did not submit that. But what the receiver... How is that in any... Under any understanding appropriate? Under Rule 56, in equity jurisdiction of the district court in receiverships, the district court does not have to follow the traditional federal rules of the receiver to give that notice. I know that. How is that equitable in any way if you're resorting to equity? It's equitable because at the time that this receiver walked into the door, walked in the door, we had a liability of $60 million. We had 500-plus investors. And they were all going to lose their asset if the receiver didn't act quickly to preserve what asset was left. That's the equity here. The receiver filed various financial status reports as soon as he got in and figured out what was going on. And from that point forward, he filed every month, well, every quarter, he filed a quarterly report telling the district court what was going on and what was the status of the financial condition of Credit Nation. The district court found when the receiver was appointed that Credit Nation was in a precarious financial position and either unwilling or unable to manage its finances. So it was essential for the receiver to step in immediately and take the action it did. But how did you calculate, how did you tell the district court how you calculated the fictitious profits? The fictitious profits were set by the court. And the court basically said, whatever amount that Credit Nation has paid on behalf of the direct investor for a premium payment, that amount has to be returned back to the receivership estate.  And that was on your motion, ex parte. No, there was a discussion with the district court and the district court put out two orders. I know, but there was nobody else on the other side at that point. With respect to the fictitious profits, there was a motion that was filed, it was not ex parte. Ex parte meaning, I mean, I know it was in the public record, I used the wrong terminology and I apologize. There was nobody on the other side of the case when the receiver filed that motion. There was nobody to oppose it, nobody to say this is wrong, nobody to say, take a step back and think twice, nothing like that. But at that point, later on, there was another group of investors that came up and objected to the payment of fictitious profits. And the court basically said the same thing, that we're trying to raise money for the receivership so the receivership can continue to operate. What I think was different with respect to this situation when you're looking at the various receivership actions that the SEC has entered into, when the receiver walked in, we had basically three tranches of investors. We had direct investors, indirect investors, and promissory note investors. We thought that what the district court was going to do was basically categorize the direct investors and the indirect investors the same. These are investors that invested into a life settlement policy. But what I think in the district court's infinite wisdom, they said, direct investors, I'm going to help you out because you have a direct investment and you have a contract with the insurance company. And that insurance company, that's a contract that we can't really step into because it's a contract between you and the insurance company. If you pay the amount of money that Credit Nation has paid on your behalf to keep this policy alive because all of the funds that have been paid in for as investments in the Credit Nation capital, it's all been dumped in the same pot of money. If you reimburse the receivership for the premium payments that Credit Nation has paid, we're going to let you take it out of the estate, and I, the court, am going to give you the opportunity to potentially recover 100% of your investment. And so to the extent that the receivership is classified here as a collection agent or executioner wasn't, first of all, it's carrying out the orders of the court. And second of all, what the court was doing was essentially elevating the status of direct investors to allow them to take the asset out of the estate so that they could continue to potentially recapture 100% of their investment. Other than that, yeah. I'm not challenging the wisdom of the scheme that or the process, the mechanism that the district court put in place to take care of the different investors. I'm not questioning that. My concerns are directed toward how the district court got there at the end of the day. So take Ms. Gravitt, for example. Correct. Okay. The allegation is that she receives a notice, a letter, whatever notification it is that gives her three days to do A or B, to assign the policy or pay the fictitious profits. Is that accurate? No, that is not. Okay. How much time did she have? She had a lot of time. What is a lot of time? First of all, Ms. Gravitt was notified in early June of 2016 that she needed to pay her fictitious profits or surrender the policy. I want to add a footnote to Ms. Gravitt is the daughter-in-law of Jim Torsha. Ms. Gravitt was given the opportunity from June 2016 to remit fictitious profits or surrender the policy. How was she given that opportunity? She was mailed the notice. Yes. And then when she did not respond to the notice, we tried to contact her on several occasions and the record is clear as how she responded to our agents. Then we filed a motion for an assignment and she had time to respond. She chose not to. The court set a hearing. She came to the hearing without an attorney. The court gave her an additional time to find an attorney and then respond. She had ample opportunity to object. Help me with the timeline. You say that sometime in 2016, she was given an order? She was given the same letter that was sent to all direct investors that said... From you? From the receiver? From the receiver. Okay. Attached was a copy of the order as well. Of the district court order? District court order that said, here's what you've been required to pay. If you would like to retain your investment, pay this amount and we're going to release it to you. Okay. And what was the... Do you remember what the deadline was to comply at that point in time? 20 or 30 days. It was not three days. We would never turn it around. And when did the receiver file a motion or take further action when she didn't do what she was asked to do? I would have to go back and look at my records, but I recall that the order on our motion for contempt was sometime in January after the first of the year. In 2017? 2017. Right. And Ms. Gravitt has appealed the motion for contempt to this court and the court denied it as moot. So, she's attempted to bring all this up and the court said, no, we're done because the policy has been assigned, it's over. And your contempt has been purged. I'm sorry, that's what the court said, your contempt has been purged, this issue is moot. The contempt issue is moot, but the assignment issue is probably not. Well, this court denied the appeal. And Mr. O'Dell was, I assume, also appealing that as well, the fact that she had to remit fictitious profits to retain her policy. It can't be that if you are required to turn over personal property on threat of contempt and jail, and you turn it over, that you lose the right to challenge the requirement that you turn over the property, right? No. Her contempt was because the district court said within so many days, I think it was seven, you have to tell the court whether you're going to surrender the policy or whether you're going to pay the premium. And she didn't either. And it was because of her failure to do that that she was found in contempt. How long after that did she assign the policy? Or, I mean, pay the fictitious profits, sorry. The court found her in contempt. She paid the fictitious profits shortly after that, so she wouldn't have to go to jail. So she was never incarcerated? I did not think she was. I thought she purged her contempt before that. She had to pay some attorney fees and she had to pay for any day that she was not purged of contempt, she had to pay an additional fine. But did the district court allow objections on the amount of attorney fees that she was assessed? Not that I recall. The court assessed the attorney fees at the hearing. I know, but based on the receiver's submission of what those attorney fees were, right? Right. Did she have a chance to object to that? No. Not that I recall. That doesn't sound right. Well... It's one thing to say summarily, I've held you in contempt, you're wrong, you've defied my orders, I'm ordering you to pay attorney's fees, that's one thing. But it's quite another to allow that same party not to object when the other side comes forward with the amount of fees, which they may think might not be justified. How did that process run its course? I don't recall Justin appealing the entry of the... Asking the court to allow him to speak on the issue of attorney fees. But again, where we are in this receivership is we have a lot of investors who have spent a lot of money. There are many, many sympathetic investors in this scheme that were losing lots and lots of money and the receiver's job was to marshal the assets for the preservation of the estate, which is what he was doing. If Ms. Gravitt did not want to pay the fictitious profits, she didn't have to, but she needed to surrender the policy so that the receivership continue with his work of liquidating the assets so that he could marshal and then make a distribution. But don't people who think that the receiver and the district court are wrong get to mount objections before the plan stage? They get to mount objections if there is a dispute as to the facts. In this case, there wasn't a dispute as to the facts. Mr. O'Dell has asked for discovery on the issue of premiums that are sought to be recovered. I believe that I have sent him the Credit Nation records that show what amounts Credit Nation paid for the Gravitt policy to keep it enforced. We have very detailed records of what was paid. But he says, I'm not denying that you did that and that's a good thing if you did, but he says that as a formal matter, the district court denied him discovery. Is that accurate? Yes. The district court did not allow him to do that. How does he get to challenge, and again, I trust what you're saying that you gave him the underlying records, but how does he get to challenge the amount of fictitious profits without knowing what the receiver relied upon? He did because when we were in this process in the district court, when he was asking, I'm entitled to know how you set these amounts, I believe it was around that time that I sent him a copy of the receivership or the Credit Nation records which show how much money we had on Ms. Gravitt's behalf. We can find that in the record? There's some documentation of it? I don't know if I sent it to him one-on-one, but I'd be happy to brief this issue to the court and show what I sent to him at the time we were going through this with Ms. Gravitt. Because for sure, the receivership did not want to slow down the receivership process on issues like these. We were definitely an open book and we were happy to show whoever was interested what information they needed in order to satisfy themselves that the receiver was only seeking the amount it was entitled to recover in order to transfer this policy to the direct investors so they can go on about their way. I'm happy to do that if you'd like me to do that. Tell me now in a nutshell why, how it's explained in the record, why the premium payments should be considered fictitious profits. So, what the district court decided was there was commingling of funds whenever anybody invested in the credit nation, whether it be a direct investor policy or indirect or a note, all the money came into the same pool. The director's investors have raised the issue that they were supposed to have their premium obligations paid by virtue of the amount they paid for the policies that we didn't, there was no money that was escrowed at all. So, what the district court decided is we have a lot of policies that need to be sold. And the receivership basically went to the district court and said, I just want to sell policies so I can raise funds. And the district court said, hold on, we've got these direct policies here. They've got a contract with the insurance company. It makes sense for these indirect investors to retain their asset because they have it directly invested into a specific policy. If they want to keep that policy, they just need to reimburse the receivership estate for the amount that credit nation has paid in premium obligations. Once they repay that amount, the receivership estate has been made whole and that asset may be taken out of the estate. Okay. And it seems like what they're complaining about is that they were not given an opportunity to contest a determination that the premium payments should be considered fictitious profits. Well, the term fictitious profits is a term of art that's used by the court. And the term, that term basically means the amount you need to pay to make the receivership estate whole so that when you take the policy out of the estate, the estate doesn't suffer a detriment. I'll ask you the same question that I asked your colleague. What do the contracts provide to the extent that they were uniform about payment of premiums for direct investors? They were not uniform. Some policy said that they would pay the premium obligations for four years. That CN would pay it or the investor would pay it? Credit nation would pay it for four years. Now with respect to the Sutherlands, the Sutherlands policy actually says that the Sutherlands will make the premium obligations. So in this case, not only were the Sutherlands required, were asked to pay the fictitious profits because if they wanted to take the asset out of the estate, they were required to anyway. The Sutherlands are creditors or are debtors of credit nation. Credit nation could file an action against the Sutherlands to recoup the $23,000 in premium obligations that we've advanced on behalf of the Sutherlands to keep the policy enforced. Just in terms of how this worked mechanically, if Mr. Sutherland had the obligation to pay the premiums, why was CN paying them? The policy that Mr. Sutherland purchased was actually a category of policies called a FEGLI policy which is Federal Employment Group Life Insurance Policy. The insured was a federal employee. His payment for the premium was taken directly out of his retirement benefit check and there was no way to transfer the payor of the policy based on the terms of the policy. So what had to happen is Mr. Martin's payment would be pulled out of his check. Credit nation would reimburse Mr. Martin and then the Sutherlands were supposed to reimburse credit nation. But that didn't happen? No. Credit nation reimbursed Mr. Martin, the Sutherlands did not reimburse credit nation. But I want to add too, the Sutherlands were frequent investors in credit nation and they have paid $37,000 of fictitious profits on other policies. And in exchange for paying $37,000 in fictitious profits, they received and retained the benefit of $6 million of death benefit. The reason why they're here today on this particular policy is that the policy had no value anymore and it was worth less than the amount of fictitious profits that were due. Not in its base value. Suppose as I understand the numbers, the face value of the policy was $235,000. They paid $155,000. The fictitious profits were $20-something thousand. So you're saying that if you have to continue paying the premiums through the expected lifespan of Mr. Martin, then the policy will not be a profit-making enterprise. Correct. Because his life expectancy changed. Got it. There are two issues that are here today and one we talked about in great deal. It's affirming the assignment of the life settlement policy to the receivership and the second is to affirm the district court's order approving the receiver's distribution plan. With respect to the distribution plan, all of the investors had an opportunity to object to the distribution plan at the moment that it was filed. The receiver, the district court put in place a scheduling order that queued up if you wanted to make a claim and then if you wanted to, and then the receiver needed to respond to disallow a claim and then there was objection. So there was ample opportunity for objections to be heard with respect to the distribution plan. Some cases suggest that allowing objections then but only then might not be enough in certain circumstances. Well, again, the process that's due is what should be required based on the circumstances and the facts of these cases were not different. Everyone invested money and they were all going to lose money. I mean, it's different than in the Elliott case where the one investor was entitled to a more expanded proceeding because the receivership believed that he was a debtor of the entity in receivership and Mr. Hagstrom believed that he was fraudulently induced to enter into an investment and in that case, the court said, yeah, you know, you're entitled to more expanded proceeding. There were other investors in the Elliott case who had surrendered securities to the defendant and they wanted additional discovery so they could talk about the terms and conditions in which they assigned the securities to the defendant and the court said, no, it's all the same. You assigned it. Once you assign your policy, you don't have any ownership rights in it. There's no difference in the facts that you're saying and it's all the same, you know, kind of understand and in this case, Mr. O'Dell and his clients haven't articulated what additional discovery is going to do. What do they need? What do they see? He referenced, Mr. O'Dell references in his briefs that what's necessary is to understand who is taking and how much they're taking and what they received prior. All that information is in our distribution, in our motion and all the exhibits attached there too. It's very detailed. They can see why we're distributing and how much. Is there anything in the record that you know of that lays out in an evidentiary sense how the fictitious profits were calculated either at the beginning stage or at the planned distribution stage when people were told you have this amount of time to object? No. So what we did not do is we did not submit a document into the evidence that says here's how much Credit Nation has paid for premium obligations for those that are now being asked to remit the fictitious profits to save to in order to take, remove their policy from the receivership state. But again, it's not a deprivation of property. If they choose not to pay the fictitious profits, it only means that the asset goes into the pool for sale and then eventual distribution. Well, but that is a deprivation of property because they're going to receive potentially less. So everyone's a loser in receivership cases. Everyone's going to lose. Not necessarily. Well, you're right. In this case, if they paid fictitious profits, they were going to be a winner. They were going to be the one shining star to go in there. So there is a deprivation of property potentially if you're required to assign the policy. Well... Because then you, there's no way you're going to get 100% on your investment or more, right? Well, yes. But we're, I mean, there's a distinction, first of all, in receivership. Everyone's a loser. It just depends on how much we're all going to lose. With respect to fictitious profits being paid, that was actually an opportunity for the district court to elevate the status of direct investors. I agree with you 100% on both of those points. But that doesn't mean there isn't a deprivation of property if you decide to assign the policy and go into the pool because then you're going to be getting about 30 cents on the dollar according to the district court's rough calculations. And if you decide that you're going to pay the fictitious profits, you at least stand a chance of recovering much more than that. The reason why it was equitable for these fictitious profits to be paid is because investors like promissory note investors that didn't have any connection with any specific policy, it was their money that was being used to fund the premium payments. So, you know, it's not as if we were attempting to punish the direct investors by saying you got to pay this or else. It was to the extent of we have to equalize and shoulder the burden. And because these promissory note investors, we've used their resources, it only makes sense that if you use their resources, you have to pay them back and then you can go on about your merry way. Now, with respect to what's happened in this case, since these appeals have been filed, the receivership has distributed $9.5 million of the receivership of the funds collected. We have about $1.1 million that's left, but the majority of the funds have been distributed. There's nothing left. So... I mean, there's nothing left. Well, there's... You said there's a million left. Well, to the extent we've already distributed $9.5 million, that $9.5 million for all intents and purposes is gone. Right. It would be extremely difficult to go and grab this back from the investors. And so to that extent, there may be a suggestion of equitable mootness as it relates to the distribution plan because it's been distributed. But it hasn't been fully distributed. Not fully. You're right. You are correct. And... Let's see. The... With respect to the appointment of the receiver, the investors and the settlers make an issue about the fact that they were not advised as to whether an appointment of a receiver was proper. There were certain findings of the district court which found that, again, Credit Nation, their liabilities exceeded their assets and that an asset freeze was necessary to preserve the status quo and preserve the sufficient funds for payment of any disgorgement award. And so it was not and it would not be prudent to stop before an appointment of a receiver and ask all the investors whether they agreed with the appointment of the receiver. And the authority of the district court to make such an appointment is given to them by virtue of its equity jurisdiction in receivership cases. But what they weren't required to notify all of the investors prior to the appointment of a receiver. Turning to the jurisdictional issues. Yes. I know we're not bound by the party's agreement, but it seems that you and Mr. O'Dell agree that with regards to Mr. Sutherland, that the order requiring him to pay or assign is appealable under 1292A1. Is that accurate? No. We do not agree that this court has jurisdiction over the Sutherland appeal. First because the issue is moot. He's already signed the policy. And, in fact, the receiver has already sold the policy. And second, under 1292A2, we do not believe that this falls within the category of something that's appealable for an interlocutory order appointing a receiver or refusing to take steps to wind up a receivership. I agree with you on 1292A2. I'm asking about A1 as an order granting, continuing, modifying, et cetera, an injunction. Why isn't this continuing an injunction by requiring him to do something which the court had signaled earlier? So, this is an order requiring him to assign a policy. It wasn't on the initial appointment of a receivership award. Right. Right? So, that would be the first response is that it's not an appeal of an injunction. And second of all- But isn't it an order modifying an injunction because the initial order that set the receiver and froze everything didn't require people to pay fictitious profits? So, no. So, the receivership appointment was just basically putting a receiver in place and freezing assets. This particular order with respect to assigning was basically transferring property to a receiver. And under the NetSphere case, orders requiring property be transferred to a receiver is not appealable. Why not? Because it goes to the various policies for not having piecemeal litigation in a receivership where you're constantly appealing the decisions of- When are they supposed to appeal? To the end. And this is what the legislature set out. When is Mr. Sutherland supposed to appeal? The final judgment. Which is when? When the receiver exhausts its resources and- And then your argument is it's all equitably moved because we've transferred everything, there's nothing to recover, there's nothing you can do. He could have- It's a good catch-22. There's no appeal available anywhere. May I respond? Of course. Okay. He could have taken procedural safeguards in place to preserve assets like filing a motion to stay for whatever the value is of what he's contesting and that amount not be He did not do that. But absent that, you're saying there's no appeal available to him practically. He can't appeal anything. He can at the conclusion of the case, he can. He can take a step to stay the distribution for the amount he contends he's due. And then when there's a final judgment, then there'll be funds available for him to recover. But you're going to argue it's moot. You're going to argue it's all moot because he's turned into policy and you've sold it. So there's no relief you can give him. That money's gone and you've distributed that money. That makes no sense to me. Because when I get there, and he's already had it, but what he's going to see is that these were amounts that the receivership paid on behalf to keep his policy enforced. If he wanted to keep the policy, then he needed to pay that. And if he didn't, now he becomes someone who goes in the pool for distribution or the ultimate distribution of funds from all the assets. But then his only appeal is that he wasn't given the right amount of distribution, not anything else. Right. That doesn't seem right either. So he can't argue that he's been denied due process. He can't argue that he was incorrectly required to pay fictitious profits or assign the policy. He can't argue that he was improperly denied discovery. He can't argue any of those things because everything is gone. The only thing he can argue is, oh, I received 31 cents on the dollar, but I really should have received 42 cents on the dollar. That's the only appeal he has available to him. Right. It's money. Right. And that money computation would change based on what status he believed he was in. But still, at the end of the day, it's money. Money is going to be his ultimate relief. So it doesn't matter if the policy wasn't sold or wasn't... But money doesn't always solve other procedural concerns, like the opportunity to be heard, et cetera. And I'm not saying their claims of due process violations have merit. I don't know what the answer to that is, but you're saying essentially that those claims can never be raised on appeal in a receivership like this one. Based on the jurisdiction of this court under 1292A1 and 2, no. It appears that the legislature has very, very narrowly limited what can be appealed with respect to receiverships, and it's the appointment of the receiver or refusing to wind up. That's what the legislature has said. Thank you, Your Honor. Thank you, Ms. Weber. Mr. O'Dell, you've reserved some time for rebuttal. Yes. Thank you. I want to address a couple of points very quickly. One, the statement was made, and it's an accurate one. All of these policies were different regarding how things were supposed to be done, yet the district court treated them all exactly the same. And when individuals like Sutherland and Gravitt, and there's others that are co-appellants, we just highlighted those two because they're starkest examples. When they said, wait a minute, my policy is different, they were never given the forum in which to raise their objection. So when counsel said, no, all these contracts were different, they were all treated the same. And that same process was, you're going to pay back what we owed. But here's what I want to highlight, because you could say, well, the premiums are what they are, and they're in the contract, and you take their word for it that they paid them. The fictitious profit does not just include the premiums. The receiver was unilaterally allowed to calculate a reasonable value of services that CN rendered in servicing the policy. So we're not just talking about the premium is $1,000 a month, we paid it for 12 months, you owe us $12,000. If you look at Sutherland, there's several thousand dollars calculated as this is essentially the reasonable value of other services that was rendered by CN Capital in servicing this policy. So we're not just talking premiums. We're talking about a completely arbitrary discretionary sum solely determined by the office of the receiver, and then that bill being sent to the policy investor and saying you owe us X for premiums, you owe us Y for servicing amounts that we've calculated. Now, you asked about the language of the Martin policy, and I've located some of that language for you. And this is why we believe it's important when you talk about, we contend, the correspondence, and there's even record in the file of correspondence with the receiver that initially the Martin policy was not going to be included. But the Martin policy itself says, fees for all services provided and the performance of duties shall be complete and included in the purchase price. That's the policy or the contract for the purchase of the policy? The contract for the purchase of the policy. The agreement that they're enforcing against us. So our defense would be... What's that language again? Fees for all services provided and the performance of duties are complete and included in the purchase price. You're saying fees includes premiums. That would be one of our arguments. Second, there's course of conduct and other correspondence that reinforces our argument in that regard. But even if you said, well, we're not going to let you put up evidence about that. It's a foregone conclusion. The premiums are what you are. Why would we pay back an arbitrary sum for reasonable value of services when the contract said those are already included? CN is supposed to be paying those all along. So this fictitious profit number, I want to make sure you understand, is not just premiums. It's this arbitrary sum that was never proven or challenged in a court of law or by any arbiter of record for what is this reasonable value of services that was awarded as part of the fictitious profits. That's some amount that was determined where CN Capital was able to say this is what we internally spent keeping up with the policy that we shouldn't have to spend. You got to pay that back too. The receiver says that with regards to Ms. Gravitt, whom we're using as sort of an example of what you think was due process gone awry, the receiver says that Ms. Gravitt had plenty of time. She was told sometime in 2016 that these were the options available to her, was given a time to do something one way or the other, didn't do it, was then sent an order, then appeared for a hearing, was told to make an election, didn't make an election, and that's when the contempt occurred. Let me give you her timeline as per the record. She was sent a letter sometime in June. Nobody disputes that. When she didn't respond to the letter, she responded negatively to the letter. On August 15th, 2016, a motion was filed with the court by the receiver to compel her and others to assign their policies. That's the motion. The next day, there's a docket entry, August 16th, from the district court, and the direction is to the receiver, mail that docket entry to all the investors. The docket entry deadline for the investors to respond to the motion- The docket entry is by the district court. There's a motion, and then the district court does a docket entry saying, motion received. Notify all the investors that they have until August 19th, three days, to respond to your motion requiring that they should assign their policies. This still isn't challenging the underlying basis for their calculation. It's just they filed a motion saying, you got to turn your policy over. On August 23rd, without a hearing, without any evidence being conducted, there was an order then requiring my client to surrender her policy. That's her timeline. Now, everything after that was about contempt. Then they moved to hold her in contempt. All of this stuff about she appeared in court, she was told to go get an attorney, that was all on the contempt. By the time I showed up, and by the time Ms. Weber did try to share with me some information about how they'd made calculations, it doesn't matter because we're no longer fighting with the district court about whether or not the claims have merit, and whether or not she owes the money, and whether or not she owes that amount of money, or whether she has any defenses. We're arguing with the district court saying, please don't put her in jail. All I was trying to do was get her some due process. I asked the court at that time, you can't take this woman and incarcerate her for contempt of an order that she has not even had an opportunity to respond to. Because three days by docket entry is not a meaningful opportunity to respond. Even if it were, you would need to conduct some degree of an evidentiary hearing. That is her timeline. When we say that she had all this time, and she was afforded counsel, that all came in a contempt. That did not come when the underlying obligation was being set forth, and she was getting these demand letters and citations for contempt. You're asking for a remand for the district court to conduct full-blown plenary proceedings with discovery, even though nine and a half million of the $10 million has already been distributed? I may exceed my time slightly in responding. I'm not asking, that's why I want to clarify, for full plenary proceedings for every investor. We need, summary proceedings are appropriate, but they have to afford some degree of due process. The Elliott case and the Liberty Capital case, both on remand, said, what does that mean? That means in the case of the Schutzman, in the Elliott case, they need to create a forum in which they can present their facts, be heard, present evidence, controversy allegations, raise defenses. That can occur in front of a special master. It could occur in front of a magistrate. It's not a full-on proceeding every time. You don't get four months of discovery, but you get something. You get something, and there's plenty of guidance as to what that something could be and could be afforded. That's what we're asking to do. If you ask the position that $9 million is gone and all the money has been distributed, all I can say is this, I raised these objections from the first day I was hired. If I were the receiver, and I were the district court, when people start making due process objections, I would have put myself on pause and solved that problem. Could you have moved for a stay? We could have moved for a stay. I will concede on this gravity, however, she would have had to obtain a stay to appeal her contempt citation. She would have been placed in the position of paying a bond. She's already been ordered to pay money. It's not feasible. The decision to grant the stay first resides with the district court judge. Then I have to come here and ask for a reciprocal stay. I raised these objections at every instance. I gave the receiver and I gave the district court every minute to pause and say, wait a minute. Wait a minute. Let's hear this out before we scramble the egg. But nobody agreed. My first opportunity to have it reviewed is now. Mr. Sutherland also is an appellant in the other appeal. He's a party in both appeals because he's also appealed the district court plan. As you pointed out, this was his first chance. We've raised these every time I've shown up in a court and said, please, please, please, just give us some degree of an opportunity to be heard in a meaningful way and present evidence. That's what we're asking you to do. All right. I think we have your argument. Thank you. And the court will be in recess until 9 o'clock tomorrow morning. All right.